# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

### No. ACM 40438 (f rev)

————————————

### UNITED STATES
*Appellee*

v.

### Mark A. PULLEY
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 24 October 2024

————————————

*Military Judge*: Matthew P. Stoffel (motions); Brian C. Mason.

*Sentence*: Sentence adjudged 28 September 2022 by GCM convened at Malmstrom Air Force Base, Montana. Sentence entered by military judge on 16 November 2022: Dishonorable discharge, confinement for 36 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant*: Major Jenna M. Arroyo, USAF; Captain Trevor N. Ward, USAF.

*For Appellee*: Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, ANNEXSTAD, and WARREN, *Appellate Military Judges*.

Senior Judge RICHARDSON delivered the opinion of the court, in which Senior Judge ANNEXSTAD and Judge WARREN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RICHARDSON, Senior Judge:

In accordance with Appellant's pleas, a general court-martial comprised of a military judge sitting alone convicted Appellant of one specification of possession of child pornography, in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934, and one specification of attempted distribution of child pornography, in violation of Article 80, UCMJ, 10 U.S.C. § 880.[1,2] Contrary to their[3] pleas, Appellant was convicted of one specification of indecent conduct, in violation of Article 134, UCMJ.[4] The court-martial sentenced Appellant to a dishonorable discharge, confinement for 36 months, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the findings. The convening authority deferred the reduction in grade and forfeitures until the entry of judgment, suspended six months of the adjudged forfeitures, and waived the resulting automatic forfeitures for six months for the benefit of Appellant's spouse and two children.

Appellant raises five issues on appeal: (1) whether the Government's delay in investigating and prosecuting this case violated Appellant's constitutional and statutory rights to a speedy trial; (2) whether the terminal element of Article 134, UCMJ, Clause 2, and applicable caselaw create a conclusive presumption, rendering Appellant's conviction under that article unconstitutional; (3) whether Appellant's conviction for indecent conduct violates the First Amendment;[5] (4) whether denying Appellant gender-affirming healthcare violated their Eighth Amendment[6] right against cruel and unusual punishment; and (5) whether the Government can prove the 18 U.S.C. § 922 firearms prohibition is constitutional as applied to Appellant. We have carefully considered issue (5) and conclude it warrants neither discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United*

---

[1] Unless otherwise specified, all references to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant's pleas were by exceptions and substitutions. The Government attempted to prove up the excepted language in the specification alleging attempted distribution of child pornography (Specification of Charge II), but was unsuccessful.

[3] Appellant's brief notes that "they, them" currently are Appellant's preferred pronouns. We have attempted to honor that preference in our writing, but generally have not altered quoted language.

[4] In accordance with their plea, Appellant was found not guilty of a second specification of indecent conduct in violation of Article 134, UCMJ.

[5] U.S. CONST. amend. I.

[6] U.S. CONST. amend. VIII.

*States v. Vanzant*, 84 M.J. 671, 680–81 (A.F. Ct. Crim. App. 2024) (holding the 18 U.S.C. § 922 firearm prohibition notation included in the staff judge advocate's indorsement to the entry of judgment is beyond a Court of Criminal Appeals' statutory authority to review); *cf. United States v. Williams*, __ M.J. __, No. 24-0015, 2024 CAAF LEXIS 501, at *12–13 (C.A.A.F. 5 Sep. 2024) (finding Courts of Criminal Appeals lack authority to modify information in the trial Statement of Results that is "not part of the findings or sentence"). As to the remaining assignments of error, we find no error that materially prejudiced Appellant's substantial rights.

## I. BACKGROUND

In May 2021, Special Agent (SA) DA with Homeland Security Investigations (HSI) posed in an online chat room as a 33-year-old father of an 8-year-old daughter. Upon entry into this particular chat room, the user was instructed to state their name, their age, their daughter's age, and whether they are "active," meaning sexually active with their daughter. Appellant entered the chat room and, using a pseudonym, indicated, "30, 5, not active." SA DA initiated a conversation with Appellant in the chat room. On 17 May 2021, Appellant sent SA DA a video that SA DA described as "a prepubescent female sucking on the toe of an adult male." Appellant accompanied the video with the statement that she "out of the blue sucked on my toe like a pro last night."

Appellant also sent SA DA three videos of a woman (AO) who Appellant thought was younger than 18 years. In one of the videos, AO removes her underwear and exposes her pubic region as she lay on a bed.

Based on the tenor of their conversation, and the videos Appellant sent him, SA DA sent a summons to the chat room host for "basic subscriber data and IP address information." The resulting information led to Appellant. After learning of Appellant's Air Force connection, HSI referred the matter to the Air Force Office of Special Investigations (OSI) in early July 2021. OSI learned that Appellant was on leave. They obtained a search authorization and waited until Appellant's return to execute it.

Meanwhile, in early June 2021, Appellant and Appellant's wife (RAP), along with their two children, traveled by car to visit Appellant's relatives. During the overnight stop on the two-day drive, RAP checked Appellant's iPad to see if videos for their daughter (RP) to watch during the drive were downloaded. While on the device, RAP looked through the photos to see if Appellant had any baby photos of their children that she did not have. She found photos and a video of their daughter in the "recently deleted" folder. She described the video as "[Appellant] sitting on the couch [in their home] opposite of [RP] and he was repeatedly sticking his big toe into her mouth." She saw the date of the photos and video was 17 May 2021; RP was 5 years old. A version of this video,

altered to add glasses over RP's face, was the video SA DA received from Appellant in the chat room.

Upon the family's return to Malmstrom Air Force Base (AFB) on 8 July 2021, the search authorization was executed and Appellant was placed in pretrial confinement. Agents seized around 25 pieces of evidence, mostly digital media. OSI agents interviewed RAP, who described finding the "very disturbing" photos and video on Appellant's iPad during their trip.

An analysis of Appellant's digital media revealed he possessed child pornography. Appellant pleaded guilty to possessing one video showing an adult woman sexually abusing a girl.

## II. DISCUSSION

### A. Speedy Trial

Appellant asserts denial of their speedy trial rights under the Sixth Amendment[7] and Article 10, UCMJ, 10 U.S.C. § 810. At trial, however, Appellant waived their right to relief for this Sixth Amendment claim. "[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). The Sixth Amendment right to a speedy trial may be waived. *United States v. Mizgala*, 61 M.J. 122, 124 (C.A.A.F. 2005). In his ruling the military judge noted: "The [d]efense motion on this issue referenced all three sources [(Rule for Courts-Martial (R.C.M.) 707, Article 10, UCMJ, and Sixth Amendment)] as the basis for the motion relief requested. At the motions hearing, [d]efense [c]ounsel made clear that the sole basis for their request for relief was Article 10[, UCMJ]." This conclusion that Appellant abandoned their Sixth Amendment claim was not challenged and is supported by the record. Therefore, we consider only Appellant's speedy trial claim rooted in Article 10, UCMJ.

#### 1. Additional Background

Appellant was placed in pretrial confinement on 8 July 2021 and remained in pretrial confinement until they were sentenced on 28 September 2022.

On 22 July 2021, Appellant first demanded a speedy trial. Appellant also demanded a speedy trial on 20 October 2021, 9 December 2021, 23 February 2022, 21 March 2022, and 24 May 2022. Between 3 August 2021 and 26 January 2022, the Government made four requests to the special court-martial

---

[7] U.S. CONST. amend. VI.

convening authority to exclude time pursuant to R.C.M. 707, each time providing a description of the progress of the investigation.

The same day Appellant was confined, on 8 July 2021 OSI agents executed a search authorization and seized 24 items of digital media. OSI worked with a state of Montana lab to extract data from two of the seized devices. On 27 July 2021, OSI sent the seized digital evidence to the Department of Defense Cyber Crime Center's Cyber Forensics Laboratory (DC3/CFL) to extract the data. Beginning around 6 August 2021, DC3/CFL began its process. After encountering mechanical issues, it completed most of the extractions and provided OSI a "findings" report on 6 October 2021.

The findings report included a "results drive" or "findings drive" containing hundreds of thousands of files. SA JC testified during a motion hearing[8]

> The report from DC3 contained, I believe, over 900,000 files. I believe there were 270 or so thousand images, several thousand videos. I reviewed all of those. I flagged around 1,400 or so images, which I suspected were child pornography, and I believe there were six videos that I flagged as child pornography. And there were also multiple web-related files, like search queries, search terms, that, I believe, were pertinent to a child porn investigation.

In late October 2021, OSI acquired and submitted warrants on nine software companies, and received responses in early November 2021. The chronology in the Government's answer to Appellant's brief lists no activity between 14 November 2021 and 4 January 2022. However, in a 13 December 2021 request to the convening authority to exclude time, the Government stated it had identified an expert in pediatrics to view the images and opine on the age of the persons depicted. It anticipated the review would be complete by 15 January 2022. According to its 26 January 2022 exclusion request, the Government learned that the previously identified expert was retiring, and they had identified a different expert, Dr. AH, to complete the review.

In early January 2022, OSI and the base legal office deputy staff judge advocate reviewed items flagged as suspected or possible child exploitation material. OSI narrowed the flagged items to 24,[9] and sent the formal request to

---

[8] SA JC testified during the hearing relating to the defense motion to exclude evidence of other misconduct under Mil. R. Evid. 404(b).

[9] At this time, OSI believed DC3/CFL's 24-file limit applied.

DC3/CFL on 25 February 2022 for a "deep-dive" follow-on analysis.[10,11] Also on 25 February 2022, OSI started making arrangements for Dr. AH to conduct a sexual maturity rating review of suspected child pornography. Dr. AH reviewed the materials on 23 March 2022, and provided a report on 31 March 2022.

Also on 31 March 2022, a total of two charges and four specifications were preferred against Appellant. The same day, they were served on Appellant and received on behalf of the special court-martial convening authority. The Government set a date of 12 April 2022 for a preliminary hearing under Article 32, UCMJ, 10 U.S.C. § 832, but had not secured a preliminary hearing officer. Appellant waived the hearing on 8 April 2022. The special court-martial convening authority forwarded the charges and specifications to the general court-martial convening authority, who received them on 29 April 2022. The general court-martial convening authority referred the charges and specifications to a general-court martial on 4 May 2022, the day after his staff judge advocate provided pretrial advice.

In the absence of agreed-upon dates for a pretrial hearing and trial, and upon the Defense's request, the trial judiciary held a docketing conference with the parties on 31 May 2022—the same day the Government sent in its docketing request. The trial judiciary deemed the Prosecution's case-ready date as 6 June 2022, and the Defense's case-ready date as 26 September 2022. It set 29 August 2022 as the date for arraignment and 26 September 2022 as the date for trial.

On 7 June 2022, Appellant's trial defense counsel requested an inquiry under R.C.M. 706 (sanity board). The Prosecution did not oppose. On 9 July 2022, the military judge ordered the sanity board. The summarized report of the sanity board is dated 12 August 2022. The report indicated one of Appellant's diagnoses was gender dysphoria.

On 24 June 2022, DC3/CFL provided OSI a 42-page report following OSI's "deep dive" request from February 2022.[12]

On 27 June 2022, upon the Defense's request, the military judge set an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing on the defense motion to release

---

[10] SA JC testified "it is part of OSI's policy to send flagged items to DC3 for follow-on examination."

[11] SA JC testified he sent additional information to DC3/CFL for follow-on analysis, but those results did not provide additional investigative "leads."

[12] The report indicates DC3/CFL received OSI's request on 23 February 2022. Other evidence in the record suggests OSI sent it on 25 February 2022. We find this discrepancy insignificant.

Appellant from pretrial confinement. The military judge scheduled the hearing for 20 July 2022, but, upon the Defense's later request, continued it to 29 August 2022—the date set for the arraignment.

As part of its investigation into Appellant, OSI worked with New Zealand authorities to obtain from a New Zealand Internet company evidence of Appellant's possession of child pornography. In September 2021, agents requested information from New Zealand on how to access an account Appellant had with a New Zealand provider. In June 2022, OSI coordinated with the Digital Child Exploitation Team, Department of Internal Affairs, New Zealand, regarding Appellant's account, and in early July 2022 received files and reports. From that lead, SA JC received and reviewed over 3,000 files, and flagged about 1,200 photos and videos as child pornography. SA JC explained that the videos and images were more complete versions of the fragments found on Appellant's devices.

On 13 July 2022, OSI officially closed its investigation into Appellant, and disseminated a lengthy report.

Appellant was arraigned on 29 August 2022. During that pretrial hearing, which ended on 30 August 2022, Appellant deferred entry of pleas and selection of forum, and litigated several motions. Among those motions were a motion for release from pretrial confinement and a motion to dismiss for a speedy trial violation.

Appellant testified on the motion to dismiss. Appellant recounted their experiences the day they were placed in pretrial confinement, their first full day of confinement, and an average day in confinement. Trial defense counsel asked Appellant a series of questions about the impact confinement had on them:

> Q. How has your time in pretrial confinement impacted you mentally?
>
> A. I would say that it's impacted it greatly.
>
> Q. Has the time in pretrial confinement increased your anxiety?
>
> A. Yes.
>
> . . . .
>
> Q. [Appellant], how has the time in pretrial affected you emotionally?
>
> A. It has greatly affected me emotionally.
>
> Q. How has it affected you psychologically?
>
> A. Also very greatly impacted that.

. . . .

Q. If you were not in pretrial confinement, would you . . . be living a more open life as a female?

A. Yes. I would be able to follow the recommendations given to me by my Mental Health providers here on Malmstrom Air Force Base.

Trial defense counsel also asked Appellant a series of questions about Appellant's preparation for trial. Appellant explained they had not reviewed all the "thousands of pages" of documents or "at least over 50" videos or media in discovery because of the unavailability of an escort and vehicle to travel to trial defense counsel's office, and the limited number of computers in that office. On cross-examination, Appellant testified they had access, albeit limited, to defense counsel, and agreed "[n]one of the members of the confinement facility sought to obstruct" that access.

Appellant also testified about gender dysphoria, and their desire to live as a female. After trial defense counsel confirmed Appellant was "aware of a process in the Air Force to allow [them] to have exceptions to live as a female," Appellant stated they had not "been able to complete that process" because of pretrial confinement. Appellant testified not being able to live as a female in pretrial confinement impacted them "a very large amount."

On cross-examination by the special trial counsel, Appellant clarified the timing of their gender dysphoria diagnosis. Appellant testified they had been "undergoing therapy to address issues of gender dysphoria" with a civilian provider and not a miliary provider,[13] but Appellant was not diagnosed with gender dysphoria "until after being placed in pretrial [confinement]." Due to that pretrial confinement, they could not continue to see the civilian provider and "had to start from scratch" with a military-affiliated provider. Appellant also clarified that, before confinement, they had taken few steps to present as female.

Trial began on 26 September 2022; Appellant was sentenced on 28 September 2022.

**2. Law**

"In the military justice system, an accused's right to a speedy trial flows from various sources, including the Sixth Amendment [and] Article 10 of the

---

[13] Appellant explained when they "first seriously considered treatment" they were "unable to, based on the previous presidential administration's decisions regarding transgender service members." Appellant sought treatment, but "outside of the military Mental Health" out of fear of "being pushed out of the service."

[UCMJ] . . . .” *United States v. Cooper*, 58 M.J. 54, 57 (C.A.A.F. 2003). “Article 10[, UCMJ,] imposes a more stringent speedy trial standard than the Sixth Amendment . . . .” *United States v. Thompson*, 68 M.J. 308, 312 (C.A.A.F. 2010) (citing *Mizgala*, 61 M.J. at 129) (additional citation omitted).

We conduct a de novo review of speedy trial claims. *United States v. Heppermann*, 82 M.J. 794, 803 (A.F. Ct. Crim. App. 2022) (citation omitted). We give “substantial deference to a military judge’s findings of fact that will be reversed only if they are clearly erroneous.” *Mizgala*, 61 M.J. at 127 (citing *Cooper*, 58 M.J. at 57–59) (additional citation omitted); *Heppermann*, 82 M.J. at 803. “A finding of fact is clearly erroneous when ‘there is no evidence to support the finding’ or when ‘although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.’” *United States v. Harrington*, 81 M.J. 184, 189 (C.A.A.F. 2021) (quoting *United States v. Criswell*, 78 M.J. 136, 141 (C.A.A.F. 2018)).

Article 10, UCMJ, provides in pertinent part: “When a person subject to this chapter is ordered into arrest or confinement before trial, immediate steps shall be taken . . . to try the person or to dismiss the charges and release the person.” 10 U.S.C. §§ 810(b)(1), 810(b)(1)(B). The speedy trial requirement of “Article 10*, UCMJ,* does not demand constant motion but does impose on the Government the standard of ‘reasonable diligence in bringing the charges to trial.’” *United States v. Cooley*, 75 M.J. 247, 259 (C.A.A.F. 2016) (quoting *Mizgala,* 61 M.J. at 129). “Short periods of inactivity are not fatal to an otherwise active prosecution.” *Mizgala*, 61 M.J. at 127 (citation omitted). We “look[ ] at the proceeding as a whole and not mere speed.” *Id.* at 129 (citation omitted). “A conclusion of unreasonable diligence may arise from a number of different causes and need not rise to the level of gross neglect to support a violation.” *Id.* (citation omitted).

> We determine whether the prosecution was reasonably diligent by employing the four-factor test articulated by the [United States] Supreme Court in *Barker v. Wingo*, 407 U.S. 514 . . . (1972): (1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant.

*United States v. Reyes*, 80 M.J. 218, 226 (C.A.A.F. 2020) (citing *Cooley,* 75 M.J. at 259). “None of these factors alone are a ‘necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.’” *Id.* (quoting *Cooley*, 75 M.J. at 259). “Rather, they are related factors and must be considered together with such other circumstances as may be relevant.” *Barker*, 407 U.S. at 533.

"The length of delay is measured under Article 10[, UCMJ,] as it is for the Sixth Amendment: from the date an accused enters pretrial confinement until the commencement of the trial on the merits." *Reyes*, 80 M.J. at 226 (footnote omitted) (citing *United States v. Wilder*, 75 M.J. 135, 138 (C.A.A.F. 2016); *United States v. Danylo*, 73 M.J. 183, 189 (C.A.A.F. 2014)).

When assessing the reason for delay, this court considers the context, because a "delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531. Additionally, a delay intended to "hamper the defense" should be weighted more heavily than a "more neutral reason such as negligence." *Id.* (footnote omitted). Where the delay is based on the prosecution's trial strategy, a time-consuming approach is permissible if the strategy is "not unusual or inappropriate" under the circumstances. *Danylo*, 73 M.J. at 187. "[O]rdinary judicial impediments, such as crowded dockets, unavailability of judges, and attorney caseloads, must be realistically balanced." *United States v. Kossman*, 38 M.J. 258, 261–62 (C.M.A. 1993).

Prejudice under *Barker* "should be assessed in the light of the three interests of the accused which the speedy trial right was designed to protect[:] . . . (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *United States v Guyton*, 82 M.J. 146, 155 (C.A.A.F. 2022) (alteration and ellipsis in original) (internal quotation marks and citation omitted). "Of these forms of prejudice, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* (internal quotation marks and citation omitted).

The remedy for an Article 10, UCMJ, violation is "dismissal with prejudice of the affected charges." *Kossman*, 38 M.J. at 262.

### 3. Analysis

Unless otherwise noted, we find sufficient evidence in the record to support the military judge's findings of fact. We review de novo whether those facts demonstrate a lack of reasonable diligence under Article 10, UCMJ, beginning with an analysis of the *Barker* factors.

#### a. Length of the Delay

The first factor under the *Barker* analysis serves as a "triggering mechanism," meaning that unless the period of delay is unreasonable on its face, "there is no necessity for inquiry into the other factors that go into the balance." *United States v. Cossio*, 64 M.J. 254, 257 (C.A.A.F. 2007) (internal quotation marks and citation omitted). Here, the military judge found that, at the time of the hearing on this motion, Appellant "had spent over 400 days in pretrial

confinement." We agree with his conclusion that "[t]his is facially unreasonable and this factor weighs in favor of the Defense."

### b. Reasons for the Delay

For this factor, "different weights should be assigned to different reasons." *Barker*, 407 U.S. at 531. "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the [G]overnment." *Id.* (footnote omitted). But "[m]ore neutral reason[s] such as negligence or over-crowded courts should be weighted less heavily." *Id.* A "delay caused by the [D]efense weighs against the defendant." *Cooley*, 75 M.J. at 260 (internal quotation marks and citation omitted). In addition, "the Government has the right (if not the obligation) to thoroughly investigate a case before proceeding to trial." *Cossio*, 64 M.J. at 258.

Appellant's primary contention is "Air Force Office of Special Investigations [ ] agents t[ook] 142 days to review DC3's eight-page extraction report." We perceive a significant difference between the report and the digital files in the results drive accompanying the report. While SA JC did not specify how long it took him to review the hundreds of thousands of files, we are confident it took considerably longer than review of an eight-page report.

The military judge found the processing of the "dozens of items of digital files" seized "required review of significant amounts of digital files." We find support in the record for the military judge's finding. He concluded this was "[t]he primary reason for pre-charging delay in this case." We add that OSI did more than review the DC3/CFL extraction report and results drives; they coordinated with a foreign country to obtain additional evidence of Appellant's possession of child pornography.

Appellant makes additional claims of lack of diligence. First, Appellant faults OSI not having "images or videos evaluated for sexual maturity until 25 February 2022." We note, however, that by 13 December 2021, the Government had identified an expert to conduct this review. Moreover, we find it not unreasonable for the Government in its investigations and prosecutions to narrow hundreds of thousands of files to a small fraction before requesting expert assistance and ultimately preferring charges.

Additionally, Appellant asserts the Government's delay from preferral to referral shows a lack of reasonable diligence. Appellant complains "it took the Government 26 days to refer charges [after waiver of the preliminary hearing]," and claims this was an unjustified delay. Appellant does not propose, however, what a reasonable period would be for the Government to process a preliminary hearing waiver, forward the preferred charges and supporting evidence from the special court-martial convening authority to the general court-martial convening authority for referral consideration, and for the general

court-martial convening authority to make a decision. The charges were referred 34 days after preferral and 26 days after the waiver was submitted. We find the Government was reasonably diligent here.

The military judge concluded "[t]he time between the preliminary hearing waiver and referral is reasonable in light of the relative novelty of Specifications 2 and 3 of Charge I [alleging indecent conduct] as well as the volume of evidence involved in this case." Regarding relative novelty, Appellant asserts the offense of indecent conduct is not novel. How the indecent conduct was charged, however, was unusual enough to prompt a motion to dismiss at trial and Appellant's assertions of error regarding Specification 2 of Charge I, discussed in Sections II.B and II.C *infra*, on appeal. However, the Government has not asserted this "relative novelty" was a reason for the delay. We give little weight to this novelty argument as we consider the Government's reasons for the delay.

Appellant also claims the Government was not reasonably diligent in notifying the trial judiciary to set a trial date. On this point, we agree with the military judge, who stated in his written ruling that the delay between service of charges on Appellant on 5 May 2022 and notice of referral to the trial judiciary on 31 May 2022 "is concerning and does not reflect reasonable diligence." However, we also agree with the military judge's finding and conclusion that "the Defense ready date reflected on [the trial judiciary] request was 26 September [2022], so this delay seems to have been irrelevant to the unavoidable delay between referral and the trial date."

Overall, the military judge found the reasons for delay to weigh in favor of the Government. We agree. The Government's investigation of Appellant involved review of hundreds of thousands of files and other digital media, in addition to processing warrants here and abroad. The Government identified, arranged, and utilized a pediatric expert to identify the ages of the children in the media, and a psychiatrist to conduct the Defense-requested sanity board. Finally, the Defense was not ready to go to trial until around four months after docketing. We find this *Barker* factor weighs in favor of the Government.

### c. Demand for Speedy Trial

The military judge found that the Defense made five demands for speedy trial. We agree with his conclusion that "[t]his factor weighs in favor of the Defense."

### d. Prejudice

The United States Supreme Court has identified three forms of cognizable prejudice under *Barker*, including oppressive pretrial incarceration, anxiety and concern, and—most seriously—impairment of the accused's defense. *Mizgala,* 61 M.J. at 129 (citing *Barker,* 407 U.S. at 532).

12

Appellant first argues the confinement itself is "inherently oppressive." However, "[g]iven that Article 10, UCMJ, is triggered only when an accused is *in* pretrial confinement, the prejudice prong of the balancing test triggered by pretrial confinement requires something more than pretrial confinement alone." *Cooley,* 75 M.J. at 262.

Next, Appellant argues prejudice in the form of denial of adequate medical care.[14] They assert the "military judge did not find prejudice because [Appellant] 'did not . . . provide examples' of the distress" in their testimony on the motion to dismiss. (Ellipsis in original). While the Government does have the ultimate burden to demonstrate it acted with reasonable diligence in bringing Appellant to trial in accordance with Article 10, UCMJ, balancing of the *Barker* factors requires Appellant to demonstrate prejudice. *See United States v. Wilson,* 72 M.J. 347, 355 (C.A.A.F. 2013) (finding appellant "failed to establish that the conditions of his confinement or any anxiety or concern that he suffered rose to the level of Article 10[, UCMJ,] prejudice"). During direct examination from trial defense counsel, Appellant stated the time in pretrial confinement impacted them mentally "greatly;" affected them emotionally "greatly," and psychologically "very greatly;" and agreed it "increased" their anxiety. The military judge found Appellant "testified baldly that his pretrial confinement has impacted him emotionally, psychologically and increased his anxiety. [Appellant] did not expand on or provide examples of these assertions." We find Appellant's general complaints of increased anxiety and being affected "greatly" or "very greatly" while confined did not sufficiently demonstrate prejudice.

Moreover, while Appellant utilized civilian-provided mental health care before he was confined, Appellant did not state they wanted to continue to receive this care. Appellant testified that he took advantage of similar care from a military provider during pretrial confinement. In one way, Appellant's medical care may have improved—Appellant's gender dysphoria was not diagnosed until after Appellant was placed in pretrial confinement. Finally, Appellant has not demonstrated that, but for being confined, they would have lived as a female.

Appellant also asserts the time in pretrial confinement "hindered [ ] their ability to assist with their defense." The military judge found that Appellant "has been able to review over 1,000 pages of discovery for the case and has not had his access to his defense counsel obstructed." While we give substantial deference to the military judge's findings of fact, his ruling does not fully address Appellant's hindrance claim on appeal. From our read of the record,

---

[14] For reasons discussed in Section II.D, *infra*, we find Appellant was not denied adequate medical care.

Appellant's inability to review materials was due in large part to the Defense's use of its office resources. Appellant did not claim he requested to view possible contraband evidence, including the charged images of child pornography, and was denied. Indeed, Appellant did not state what he intended to review but was unable to review due to their confinement status.

The military judge found that "[c]onsidering the conditions described by [Appellant], his pretrial confinement is not oppressive, appears to be set up to minimize his anxiety and concern and limits the possibility that his defense will be impaired in any way." The military judge weighted this prejudice factor in favor of the Government. We do as well.

### e. Barker *Analysis Conclusion*

Considering the fundamental demand of Article 10, UCMJ, for reasonable diligence, and considering the *Barker* factors, we conclude Appellant was not denied their right to a speedy trial under Article 10, UCMJ. While length of the overall delay and Appellant's assertion of their right to a speedy trial weigh in favor of Appellant, both the lack of prejudice and the reasons for the delay from trial docketing to trial date weigh against Appellant. The Government's primary reason for the delays was a common one: the need "for the Government to marshal and weigh . . . forensic evidence[ ] before proceeding to trial." *Cossio*, 64 M.J. at 257. While the Government might have been able to move the case more expeditiously at some points in time, the relatively short delays and neutral reasons demonstrate the Government acted with reasonable diligence overall. Our review of the record, including the findings of fact made by the military judge, firmly convinces us that the Government proceeded to trial with reasonable diligence under the circumstances of the case, and Appellant was not denied their Article 10, UCMJ, right to a speedy trial.

## B. Sufficiency of Convictions

Appellant claims error in the military judge's acceptance of their plea of guilty to possession of child pornography (Specification 1 of Charge I) and attempted distribution of child pornography (Specification of Charge II), and the military judge's finding of guilt, contrary to Appellant's plea of not guilty, to indecent conduct (Specification 2 of Charge I). Appellant's contentions center on the terminal element of Article 134, UCMJ, requiring the conduct be of a nature to bring discredit upon the armed forces. Appellant claims they were "found guilty of three specifications through unconstitutional conclusive presumptions" instead of distinct "proof of the terminal element."

### 1. Additional Background

#### a. Plea Inquiry

Towards the beginning of his inquiry into Appellant's pleas of guilty, the military judge defined service-discrediting conduct as "conduct which tends to harm the reputation of the service or lowers it in public esteem."

Such conduct was an element of the charged offense of Specification 1 of Charge I, under Article 134, UCMJ. Before the military judge asked Appellant specifically about this conduct in relation to this offense, Appellant said:

> . . . I understood that the content I was seeking was not legal.
>
> . . . .
>
> And I understood [the zip file I found] would likely contain pornographic content of persons who were below the age of 18.
>
> I know that these types of images are considered child pornography and are illegal to possess.
>
> . . . .
>
> I know that my behavior in 2021 was not acceptable. Society respects the honors of those serving in uniform and service members are expected to hold themselves to the highest and there and protect our society. Knowing that someone in uniform was actively looking for child pornography involving teenagers and in doing so downloaded and continue to possess the video described would bring discredit upon the armed services.

The following is from the end of the inquiry into Specification 1 of Charge I:

> [Military judge (MJ)]: Do you admit that your actions were of a nature to bring discredit upon the Armed Forces?
>
> [Appellant]: Yes, Your Honor. And that's because the public holds members who serve in high regard and any member acting in such a way brings discredit upon the Armed Forces.
>
> . . . .
>
> MJ: Do you agree and admit that your conduct was of a nature to bring discredit upon the Armed Forces?
>
> [Appellant]: Yes, Your Honor.

Appellant described what the community might think of the video they possessed:

> MJ: . . . . Do you believe that video to be obscene?

15

[Appellant]: Yes, Your Honor.

MJ: Why do you say that?

[Appellant]: I believe it was obscene based on the fact that it was an adult female with what looked like a prepubescent female and exposing her genitalia to the recording device and basically masturbating the prepubescent child.

MJ: Do you believe that an average person applying contemporary community standards would find that video as a whole that it appeals to the prurient interest in sex and portrays sexual conduct in a patently offensive way?

[Appellant]: Yes, Your Honor.

MJ: Why do you say that?

[Appellant]: I would say yes based on the generally accepted ideas of what obscene is and what would be illegal conduct to do to a minor child.

The Specification of Charge II, under Article 80, UCMJ, did not directly include service-discrediting conduct as an element. However, one element was that the act was done with specific intent to commit the offense of distribution of child pornography, and that attempted offense has the element of service-discrediting conduct. The following is from the inquiry into the Specification of Charge II:

[Appellant]: Sir, I do believe that [the video] would be obscene just based on the facts that I believed at the time that she was a minor under the age of 18. That, you know, with the definition of obscene depicting minors engaging in sexually explicit conduct does not [sic] show prurient interest in sex or sexual conduct and is patently offensive that a reasonable person would not find any literary, artistic, or political value in the image that I possessed.

MJ: Do you believe your actions were of a nature to bring discredit upon the Armed Forces?

[Appellant]: Yes, Your Honor.

MJ: Why do you think that?

[Appellant]: Once again based on the idea that service members are held in a higher standard and the possession or distribution or attempted distribution of child pornography would – is service discrediting action.

. . . .

MJ: Did you or do you admit that at the time that you sent that video [to the undercover agent] – the one we've been talking about where [AO] exposed [her] pubic region after lying on her bed . . . do you admit that you specifically intended at that time to commit the offense of distribution of child pornography?

[Appellant]: Yes, Your Honor.

. . . .

[Appellant]: . . . . [I]f [AO] had been under the age of 18, I would have committed an offense of distribution of child pornography.

### b. Findings

The parties litigated Specification 2 of Charge I, alleging indecent conduct. In closing argument, the Defense argued the Government had not presented evidence sufficient to prove the charged conduct was service discrediting. In rebuttal, circuit trial counsel argued as follows:

Your Honor, finally on service discrediting piece. I just briefly want to touch on this. Defense counsel cited that there is conduct that [by its nature] is enough to be service discrediting without having to put on specific evidence. And Your Honor, sending another dirty dad pictures, a video of how you're grooming your five-year-old daughter, that is conduct that is of a nature to bring discredit upon the Armed Forces. You heard testimony from Agent [DA] that he was aware that [Appellant] was in the Air Force. Your Honor, this is service discrediting. This is indecent conduct.

The Defense requested the military judge enter special findings supporting the factual basis of a finding of guilt. *See* R.C.M. 918(b). The Government did not oppose, and the military judge granted the request. The military judge entered findings on the only litigated specification resulting in a finding of guilty—Specification 2 of Charge I.

In his written findings, the military judge made several findings relating to SA DA's chat conversation with Appellant. He found that "the chat topic focused on whether each other were actively sexually with their daughters." He found that "[Appellant] sent SA [DA] a video of [Appellant's] 5[-]year-old daughter, [RP] sucking on his toe" with Appellant's description that "'she out of the blue sucked on [Appellant's] toe like a pro.'" The military judge described the video as "[RP] engaging in an action that is shockingly similar to one engaging in oral sex on a male's penis." In this video, the military judge thought RP "appear[ed] to be even younger" than five years. The military judge also

made findings relating to Appellant's comments about neighborhood children planning to play on a water slide at Appellant's home. He found the "context of the entirety of the conversation make clear that [Appellant's] statement indicated [Appellant's] present intent to record images or videos [of the children] in some 'perv' or perverted way."

Specifically in relation to the service-discrediting element of that offense,[15] the military judge found:

> (1) As part of SA [DA]'s investigation of [Appellant's] conduct in the private chat, he learned that [Appellant] was a member of the United States Air Force.

> (2) After the . . . chat conversation between SA [DA] and [Appellant] was complete, using IP address information and subscriber information, investigators learned from the internet service provider that [Appellant] resided on-base at . . . Great Falls, [Montana].

### 2. Law

#### a. Article 134, UCMJ

The UCMJ makes criminal "all conduct of a nature to bring discredit upon the armed forces . . . ." Article 134, UCMJ. The President defined the service-discrediting clause as follows:

> *Conduct of a nature to bring discredit upon the armed forces (clause 2).* "Discredit" means to injure the reputation of. This clause of Article 134 makes punishable conduct which has a tendency to bring the service into disrepute or which tends to lower it in public esteem.

*Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 91.c.(3).

The United States Court of Appeals for the Armed Forces (CAAF) concluded that for an offense charged in violation of Clause 2 of Article 134, UCMJ, "proof of the conduct itself *may* be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that, under all the circumstances, it was of a nature to bring discredit upon the armed forces." *United States v. Phillips* 70 M.J. 161, 163 (C.A.A.F. 2011). The CAAF recently reaffirmed its holding in *Phillips. See United v. Wells*, ___ M.J. ___, No. 23-0219, 2024 CAAF LEXIS 552, at *12 (C.A.A.F. 24 Sep. 2024) ("Consistent with our precedent, we

---

[15] The military judge prefaced his findings on this element with: "In addition to the above findings [supporting the other elements], the following findings support the [c]ourt's conclusion that this element has been met beyond a reasonable doubt."

reiterate that whether any given conduct violates Clause 2 is a question for the trier of fact to determine, based upon all the facts and circumstances; it cannot be conclusively presumed from any particular course of conduct.").

In *Heppermann*, our court addressed service-discrediting conduct as the terminal element:

> "[T]he degree to which others became aware of the accused's conduct may bear upon whether the conduct is service discrediting," but actual public knowledge is not a prerequisite. "The trier of fact must determine beyond a reasonable doubt that the conduct alleged actually occurred and must also evaluate the nature of the conduct and determine beyond a reasonable doubt that [the appellant]'s conduct would tend to bring the service into disrepute if it were known."

82 M.J. at 801 (alterations in original) (quoting *Phillips*, 70 M.J. at 165, 166) (additional citation omitted).

The President also promulgated elements and definitions for the offenses of possession and distribution of child pornography under Article 134, UCMJ, and the offense of attempt under Article 80, UCMJ. *See MCM*, pt. IV, ¶¶ 95.b, c; 4.b, c.

The elements of possession of child pornography, as alleged in Specification 1 of Charge I, include that: (1) Appellant knowingly and wrongfully possessed child pornography; and (2) under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶¶ 95.b.(1)(a), (b).

The elements of attempted distribution of child pornography, as alleged in the Specification of Charge II, include that: (1) Appellant did a certain overt act;[16] (2) the act was done with the specific intent to commit the offense of distribution of child pornography, an offense under the UCMJ; (3) the act amounted to more than mere preparation; and (4) the act apparently tended to effect the commission of the intended offense. *See MCM*, pt. IV, ¶¶ 4.b.(1)–(4). Element (2) required Appellant have the specific intent to commit the offense of distribution of child pornography in violation of Article 134, UCMJ. The elements of that offense are: (1) the accused knowingly and wrongfully distributed child pornography to another; and (2) under the circumstances, the

---

[16] Appellant does not challenge the military judge's recitation of this element: "That in the continental United States on 17 May 2021 you did a certain overt act that is attempt to knowingly and wrongfully distribute child pornography." We find no prejudice; the record indicates the parties understood the charged overt act was sending the video, not attempting to send the video.

accused's conduct was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶¶ 95.b.(3)(a), (b).

The elements of indecent conduct, as alleged in Specification 2 of Charge I, include that: (1) Appellant engaged in certain conduct, specifically "sending a video of [RP], a child who had not yet obtained the age of 12 years, sucking on the toe of [Appellant] to another person while discussing the possibility of engaging in lewd acts with [RP] and other female children in the future;" (2) the conduct was indecent; and (3) under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶¶ 104.b.(1)–(3).

### b. Guilty Plea Inquiries

A military judge's decision to accept a guilty plea is reviewed for abuse of discretion, and questions of law arising from the guilty plea are reviewed de novo. *United States v. Kim*, 83 M.J. 235, 238 (C.A.A.F. 2023) (citing *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)).

"We give the military judge broad discretion in the decision to accept a guilty plea because the facts are undeveloped in such cases." *Id.* (citing *Inabinette*, 66 M.J. at 322). "[I]n reviewing a military judge's acceptance of a plea for an abuse of discretion appellate courts apply a substantial basis test: Does the record as a whole show 'a substantial basis in law and fact for questioning the guilty plea.'" *Inabinette*, 66 M.J. at 322 (quoting *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)).

"The plea inquiry must establish the factual predicate for the plea," including "a factual basis for concluding that appellant's conduct was service discrediting" when so alleged under Article 134, UCMJ. *United States v. Jordan*, 57 M.J. 236, 239–40 (C.A.A.F. 2002) (footnote omitted).

### 3. Analysis

#### a. Guilty Pleas

Appellant asserts the "military judge abused his discretion by failing to illicit [sic] evidence of the service discrediting nature of [Appellant's] conduct during the [guilty-plea] inquiry" into the offenses of possession of child pornography (Specification 1 of Charge I) and attempted distribution of child pornography (Specification of Charge II). We disagree.

Appellant told the military judge, under oath, that the possession of child pornography to which they pleaded guilty would and did bring discredit upon the armed forces. Appellant stated: "Knowing that someone in uniform was actively looking for child pornography involving teenagers and in doing so downloaded and continue to possess the video described would bring discredit upon the armed services." But Appellant also stated their actions were of a

nature to bring discredit upon the armed forces because "any member acting in such a way *brings* discredit upon the Armed Forces." (Emphasis added).

Appellant provided a factual basis for their conduct being of a nature to bring discredit upon the armed forces. In addition to the charged conduct of simply possessing child pornography, Appellant added that "actively looking for child pornography involving teenagers" and downloading it would bring discredit and "any member acting in such a way *brings discredit* upon the Armed Forces." Moreover, in discussing its obscenity, Appellant admitted that the "community" would find the video Appellant possessed to "portray sexual conduct in a patently offensive way" because it depicted "what would be illegal conduct to do to a minor child." These facts support Appellant's admissions that their possession was of a nature to bring discredit upon the armed forces under Article 134, UCMJ. *See Jordan*, 57 M.J. at 239 (reviewing court can look to entire record to determine whether a plea was provident).

Appellant stated they would have completed the act of distribution of child pornography if the image they sent to an undercover agent was of a person under 18 years of age. Appellant admitted specifically intending the elements of the attempted offense. Regarding how they intended to commit service-discrediting conduct, Appellant referred back to their statement made in relation to the possession specification: "Once again based on the idea that service members are held in a higher standard [ ] the possession or distribution or attempted distribution of child pornography would – is service discrediting action."

Appellant provided a factual basis for intending to distribute child pornography, including intending that their conduct would be of a nature to bring discredit upon the armed forces. Appellant admitted that "attempted distribution of child pornography would – *is service discrediting action*." (Emphasis added). Appellant repeated that "service members are held in a higher standard." Regarding the obscenity of this video, Appellant stated, "I believe the society considers [child pornography] obscene" and Appellant "hit send multiple times in sending videos to the undercover agent." These facts support Appellant's admissions that he attempted to distribute child pornography, including intending to participate in conduct of a nature to bring discredit upon the armed forces under Article 134, UCMJ.

### b. Findings

Appellant argues we should not apply *Phillips*, asserting the CAAF in that case created an "unconstitutional conclusive presumption": whether conduct meets the service-discrediting element "can be presumed from the underlying misconduct."

Appellant asserts "[n]o evidence at trial constituted proof of the terminal element." Yet Appellant also asserts the military judge's special findings "found that evidence for the first two elements of Article 134, [UCMJ,] indecent conduct, satisfy the terminal element." Appellant argues the testimony of investigators was "insufficient to satisfy the terminal element beyond a reasonable doubt because no evidence was elicited . . . that they believed the conduct to be service discrediting or that their view of the Armed Forces was altered in any way."

We follow *Wells* and *Heppermann*, and determine Appellant's conviction for Specification 2 of Charge I was not the result of an "unconstitutional conclusive presumption." The factfinder is not limited to consideration of direct evidence of whether the reputation of the Air Force was discredited, or would have been discredited if the misconduct was known. *See Heppermann*, 82 M.J. at 802. "[T]he military judge could consider other evidence in determining whether Appellant's conduct tended to discredit the service." *Id.* (citing *United States v. Anderson*, 60 M.J. 548, 555 (A.F. Ct. Crim. App. 2004)) (additional citation omitted).

We find the military judge had a sufficient basis from the evidence introduced during the litigated portion of the trial to determine beyond a reasonable doubt that Appellant's conduct charged in Specification 2 of Charge I was of a nature to bring discredit upon the armed forces. The evidence demonstrated Appellant used an online chat platform for fathers to communicate about engaging in inappropriate acts with daughters, used that platform to send a video of their daughter mimicking oral sex, and discussed video recording other children in a perverted way. Appellant did not know the person with whom they chatted, and that person learned Appellant was a member of the United States Air Force. We conclude Appellant was not convicted "through an unconstitutional conclusive presumption."

## C. Indecent Conduct

Appellant asserts their acts charged as indecent conduct under Article 134, UCMJ, amounted to speech protected by the First Amendment. Specifically, Appellant claims their language was not obscene,[17] and therefore was protected speech, and moreover, the Government failed to prove a connection to the military environment. We find no relief is warranted.

### 1. Additional Background

Specification 2 of Charge I reads, in part, that Appellant:

---

[17] Appellant does not directly assert the military judge misapprehended the meanings of "indecent" or "obscene."

> Did . . . commit indecent conduct, to wit: sending a video of [RP], a child who had not yet obtained the age of 12 years, sucking on the toe of [Appellant] to another person while discussing the possibility of engaging in lewd acts with [RP] and other female children in the future . . . .

As this was a military judge-alone trial, the military judge did not articulate elements and definitions for the specification alleging indecent conduct. However, in relation to Specification 1 of Charge I—possession of child pornography to which Appellant pleaded guilty—the military judge defined "obscene" for Appellant as follows:

> Obscene means that the average person applying contemporary community standards would find that the visual images depicting minors engaging in sexually explicit conduct when taken as a whole appeal to the prurient interest in sex and portrays sexual conduct in a patently offensive way that a reasonable person would not find serious literary, artistic, political, or scientific value in the visual images depicting minors in engaging in sexually explicit conduct.

In support of this assignment of error, where Appellant argues that "[o]bscenity is a category of unprotected speech," Appellant provides a similar definition of obscene:

> (1) [An] average person, applying contemporary community standards would find [the speech], taken as a whole, appeals to the prurient interest;

> (2) [The speech] depicts or describes, in a patently offensive way, sexual conduct specifically defined by applicable state law; and

> (3) [The speech], taken as a whole, lacks serious literary, artistic, political, or scientific value.

(Alterations in original) (citing *Miller v. California*, 413 U.S. 15, 24 (1973)).

**2. Law**

We review de novo whether a statute is unconstitutional as applied. *United States v. Goings*, 72 M.J. 202, 205 (C.A.A.F. 2013) (citation omitted).

Article 134, UCMJ, prohibits "conduct of a nature to bring discredit upon the armed forces." 10 U.S.C. § 934. Among the offenses the President enumerated under Article 134, UCMJ, is indecent conduct. *See United States v. Rocha*, 84 M.J. 346, 350 (C.A.A.F. 2024) (citing *MCM*, pt. IV, ¶ 104.b). The President explained: "'Indecent' means that form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and

tends to excite sexual desire or deprave morals with respect to sexual relations." *MCM*, pt. IV, ¶ 104.c.(1).

The CAAF "has long held that 'indecent' is synonymous with obscene." *United States v. Meakin*, 78 M.J. 396, 401 (C.A.A.F. 2019) (citation omitted). "It is well-settled law that obscenity is not speech protected by the First Amendment, regardless of the military or civilian status of the 'speaker.'" *Id.* (citations omitted). Speech conveying "'repugnant sexual fantasies involving children'" that "appealed, and was intended to appeal, to the prurient interest" is not protected speech. *Id.* (citation omitted).

In *Meakin*, the CAAF noted the appellant's "obscenity was not contained within his home for consideration within his own mind" but instead the appellant "transmitted his written obscenities" to "individuals whose true names he did not even know and whom he had not met." *Id.* at 402–03. The CAAF found such speech was not constitutionally protected. *Id.* at 403.

In cases where an appellant was convicted for speech charged as service discrediting under Article 134, UCMJ, courts first determine whether the speech "is protected speech under the First Amendment," then analyze "whether the Government has shown a reasonably direct and palpable connection between the speech and the military mission or military environment." *United States v. Wilcox*, 66 M.J. 442, 449 (C.A.A.F. 2008). The Government must "prove a direct and palpable connection to the military mission or environment not only when it is clear that the First Amendment would protect speech in a civilian context, but also in cases . . . where a court cannot determine whether the speech would be protected." *United States v. Grijalva*, 84 M.J. 433, 2024 CAAF LEXIS 358, at *13–14 (C.A.A.F. 26 Jun. 2024) (citation omitted).

Categories of speech not protected by the First Amendment

> include: (1) incitement to imminent lawless action; (2) obscenity; (3) defamation; (4) speech integral to criminal conduct; (5) fighting words; (6) child pornography; (7) fraud; (8) true threats; and (9) speech presenting some grave and imminent threat the Government has the power to prevent.

*United States v. Smith*, ___ M.J. ___, No. 23-0207, 2024 CAAF LEXIS 527, at *9 (C.A.A.F. 13 Sep. 2024) (citation omitted).

### 3. Analysis

Appellant maintains "that their purely private communications with another adult did not constitute obscenity." Appellant also questions the CAAF's holdings that "indecent" is synonymous with "obscene."

First, we note Appellant fails to explain why their conduct was not obscene even under their own definition of obscene speech. That is, Appellant does not assert the language did not (1) appeal to the prurient interest, (2) depict or describe, in a patently offensive way, sexual conduct with a minor, and (3) lack serious literary, artistic, political, or scientific value.

The Government argues "the video of Appellant's daughter sucking on Appellant's toe is obscene in and of itself." Additionally, the Government argues Appellant's conversation with "a stranger" focused on sex, incest, and children, and Appellant's intention to record children in some "perverted way" all support a finding of obscenity.

We reject Appellant's argument that Appellant's language was not obscene because it consisted of "purely private communications with another adult." Similar to the CAAF's findings in *Meakin*, Appellant's "obscenity was not contained within his home for consideration within his own mind" but instead "transmitted" to SA DA, an "individual[ ] whose true name[ ] he did not even know and whom he had not met." *Id.* at 402–03. We find the CAAF's considerations of "indecent" and "obscene" in *Meakin* to be controlling in this case. And as the CAAF did in *Meakin*, we find Appellant's speech was not constitutionally protected. *Id.* at 403.

Finally, we easily resolve against Appellant their argument that analysis under *Wilcox* would result in relief. We found Appellant's speech was not constitutionally protected speech. Even if that determination were a close call, we discern a direct and palpable connection to the military environment in this case. Appellant's speech included communications about Appellant's daughter, a military dependent, and was accompanied with a video of her sucking Appellant's toe that Appellant recorded in their shared home on a military installation.

We find Appellant was not convicted for speech protected by the First Amendment.

## D. Conditions of Confinement

Appellant asserts the "Government's failure to provide [Appellant] with any gender dysphoria treatment for three years amounts to deliberate indifference of a serious medical need" and, as a result, Appellant's "right against cruel and unusual punishment was violated." Appellant's requested remedy is the sentence to a punitive discharge be "set aside or otherwise disapproved." We find Appellant has failed to demonstrate entitlement to relief under *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006), and deny relief.

**1. Additional Background**

Appellant was confined first at Malmstrom AFB, Montana. Pretrial confinement began on 8 July 2021, and post-trial confinement began on 28 September 2022. Appellant was transferred to the Navy Consolidated Brig (NAVCONBRIG), Charleston, South Carolina, in December 2022. Appellant's informal complaint during the end of their time at NAVCONBRIG provides some history of Appellant's requests for treatment there.

On 18 June 2024, Appellant filed an informal complaint pursuant to Article 138, UCMJ, 10 U.S.C. § 938, and Air Force Instruction (AFI) 51-505, *Complaints of Wrongs under Article 138, Uniform Code of Military Justice* (Apr. 2019), to the commander of the Air Force Security Forces Center (AFSFC). Appellant alleged in this complaint that despite repeated requests that they "receive medical care to manage the symptoms of [their] GD [(gender dysphoria)]," Appellant "ha[s] not received the requisite medical care." Appellant specifically requested hormone therapy. Appellant asserted denial of treatment "caused [Appellant] significant harm, including immense clinical distress associated with untreated GD."

Appellant attached to their informal complaint medical information, treatment requests, confinement clinic notes, and treatment plan memoranda. One document is a memo from Lieutenant Colonel (Lt Col) JS, the medical director of the Transgender Health Medical Evaluation Unit (THMEU) at Joint Base San Antonio-Lackland, Texas, to Appellant, dated 21 September 2023. The THMEU evaluated Appellant's diagnosis of GD from 1 June 2022, confirmed the diagnosis on 24 August 2023, and signed a medical treatment plan (MTP) on 21 September 2023. The plan included "Gender Affirming Hormone Therapy (GAHT) with an estimated start date of October 2023." The memo stated Appellant was required to obtain commander concurrence. The MTP identifies Appellant's unit and commander as those at the time of the court-martial at Malmstrom AFB, not a confinement commander. Appellant signed a memo notifying the AFSFC Commander of the MTP on 30 January 2024.[18]

The earliest-dated confinement treatment request Appellant attached to their Article 138, UCMJ, request is dated 7 September 2023, shortly before the MTP was issued. It shows Appellant requested an "appointment to discuss medication, and schedule next appointment with them," and the response indicated Appellant discontinued a medication and they were "pending action from THMEU." On 28 September 2023, Appellant requested an "update on ETP [(exception to policy)] letters" and "medication start date" as referenced in the MTP. The response was another note to follow up with THMEU. On

---

[18] Our review of the record does not indicate whether this memo was received.

11 October 2023, Appellant asked again about the medication start date. The response stated Appellant's "paperwork has been forwarded to the Air Force Confinement and Corrections legal team for review[;] this process may take some time." Appellant reached out to the NAVCONBRIG Commander and the "Air Force Confinement Legal Team" in November and December 2023 respectively, urging swift action to approve the MTP.

Appellant made a request on 14 March 2024 "to speak to Dr. C about medication changes" and "other mental health concerns," and that they were still awaiting commander responses on the MTP. The response was Appellant had an appointment with the doctor and was provided the status of the MTP.

On 21 April 2024, Appellant wanted to "discuss changes to MTP & resubmit to commander for signature." On 28 May 2024, Appellant requested an "update of approval for medical and treatment plan," adding "currently 39 days till release from confinement." The response was that it was still "pending with Air[ F]orce legal."

The AFSFC Commander dismissed Appellant's informal complaint on 1 July 2024. The commander cited AFI 51-505, ¶ 1.3.3.1, to explain that "acts or omissions that were not initiated, carried out or approved by your commander are not eligible for Article 138[, UCMJ,] review." He continued, stating:

> I was not aware of your diagnosis or request for GD treatment until I received an email from your Defense Counsel on 18 June 2024. Not only did I not make any act or omission with respect to your requests for treatment, but I am also not aware of any other commander that took any action with respect to your requests for treatment.

Appellant has not moved to attach a declaration for this court to consider Appellant's personal claims of denial of treatment.

We granted the Government's motion to attach three declarations addressing Appellant's claims. The declaration from the assistant noncommissioned officer in charge of the confinement facility at Malmstrom AFB states they have no records "related to [Appellant's] gender dysphoria while [Appellant] was in confinement" there. However, Appellant "was sent to mental health many times under [Appellant's] own request."

Another declaration is from "the main contact for coordinating [Appellant's] psychiatric and transgender health care," Technical Sergeant (TSgt) KD.[19] She

---

[19] Technical Sergeant KD was the staff member who responded to Appellant's confinement treatment requests.

asserted Appellant "was not denied medical treatment of any kind, including for gender dysphoria." She outlined in detail the efforts and challenges in getting Appellant GD healthcare.[20] She explained that "[g]ranting an Exception to Policy for dress and appearance and for use of facilities, in addition to receiving hormonal treatment to transition to female, while at an all-male Brig, required the need for guidance from both the Air Force and the Navy." She worked with Appellant to arrange "a telehealth kiosk [for Appellant] to have confidential telehealth appointments required by . . . THMEU," because Appellant was "the first prisoner to interact with THMEU at NAVCONBRIG." THMEU and NAVCONBRIG started making arrangements for this care as early as January 2023. At different points, Appellant told TSgt KD they did not want to pursue the exception to policy, but did want hormone therapy. TSgt KD does not state whether the MTP was ever approved; the last entry in her timeline is 27 June 2024, when Appellant was notified "the Brig offered him the ability to grow out hair and nails."

The third declaration is from Mr. EO, Director, Air Force Confinement and Corrections.[21] He first explained Appellant's confinement release dates:

> [Appellant] declined to complete or participate in necessary sex offender treatment. He was originally set to be released in Dec[ember 20]23 to mandatory supervised release (MSR). He declined to provide a suitable reintegration to society plan prior to the Dec[ember 20]23 release. He was found "At Fault" by the Air Force Clemency and Parole Board, for not providing suitable reintegration plan[;] this action pushed his confinement release date out until 6 Jul[y 20]24.

Mr. EO then also described Air Force coordination of Appellant's requests for GD treatment.

> Prior to [Appellant's court-m]artial, he was seeking medical care for potential Gender Dysphoria (GD). He was medically cleared to seek further specific GD treatment in Aug[ust]/Sep[tember 20]23. [Appellant] requested to continue down the GD medical route in Oct[ober 20]23 which is when my office first learned of the GD medical issue. His paperwork was incomplete and sent back to NAVCON Brig Charleston for [Appellant] to update.

---

[20] She noted Appellant "received treatment and counseling on numerous occasions from the brig psychiatrist for other mental health concerns and medication that was separate from his gender dysphoria."

[21] Mr. EO's office appears to be the "Legal" office referenced by TSgt KD.

. . . .

[Appellant] re-accomplished his request for transgender treatment paperwork Jan[uary 20]24 and legal advice was sought again this time through Lt Col W[,] AFIMSC[22 legal advisor]; Lt Col W[ ] suggested contacting the Transgender Health Medical Evaluation Unit (THMEU) Medical Lead Lt Col [J]S for guidance. Lt Col [J]S did not provide guidance as to whether the member needed to immediately begin the GD medication and understood my initial concerns for the member to start treatment while in custody. In fact, at the time of the THMEU approval for GD treatment, it was not known by the THMEU that [Appellant] was in confinement. The THMEU team did not know the member had been charged with sex crimes against his own child. My concern was if the member started treatment in confinement and had a break due to release from confinement. Then further delay in constant care/medication to the member that he would be at risk medically causing a hardship or harm. Additional concerns for me were NAVCON Brig Charleston was not a suitable location to begin GD transition, appropriate medication to be given could not be confirmed available at NAVCON Brig Charleston, NAVCON Brig Charleston would be forced to house [Appellant] in segregated housing, and finally the member had a short time left on their sentence. Based on the circumstance, the member's request was never denied, it was pending legal and further medical review.[23]

. . . .

[The AFSFC Commander] approved for [Appellant] to initiate further transgender treatment provided by Tricare [medical insurance] once he released from confinement and set up residence in the civilian populace.

Like Technical Sergeant KD, Mr. EO noted the novelty of Appellant's situation. "There is no [Department of Defense] guidance with respect to GD diagnosis within the military confinement world . . . ."

---

22 The Air Force Security Forces Center is a subordinate unit of the Air Force Installation and Management Support Center. *Air Force Security Forces Center*, AIR FORCE INSTALLATION & MISSION SUPPORT CENTER, https://www.afimsc.af.mil/About-Us/ (last visited 24 Sep. 2024).

23 On this last point, for purposes of analysis we consider failure to approve Appellant's request to be a de facto denial.

**2. Law**

Under this court's Article 66(d), UCMJ, 10 U.S.C. § 866(d), mandate to approve only so much of the sentence as we find "correct in law," we cannot affirm "an unlawful sentence, such as one that violates the prohibition against cruel and unusual punishment in the Eighth Amendment and Article 55, UCMJ[, 10 U.S.C. § 855]." *United States v. Jessie*, 79 M.J. 437, 440 (C.A.A.F. 2020) (citing *United States v. Erby*, 54 M.J. 476, 478 (C.A.A.F. 2001)).

"In general, we apply the [United States] Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, UCMJ, except where legislative intent to provide greater protections under Article 55, UCMJ, is apparent." *United States v. Gay*, 74 M.J. 736, 740 (A.F. Ct. Crim. App. 2015) (citation omitted), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016). To demonstrate a violation of the Eighth Amendment, an appellant must show:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [his] health and safety; and (3) that he has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ . . . .

*Lovett*, 63 M.J. at 215 (first ellipsis in original) (internal quotation marks and citations omitted). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted).

"Denial of adequate medical attention can constitute an Eighth Amendment or Article 55[, UCMJ,] violation." *United States v. White*, 54 M.J. 469, 474 (C.A.A.F. 2001) (citing *United States v. Sanchez*, 53 M.J. 393, 396 (C.A.A.F. 2000)). However, the standard is "reasonable" medical care rather than "perfect" or "optimal" care. *Id.* at 475. (citation omitted). The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners," whether manifested by prison officials "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (citations omitted); *see also Ziglar v. Abbasi*, 582 U.S. 120, 148 (2017) (noting the United States Supreme Court "has long made clear the standard for claims alleging failure to provide medical treatment to a prisoner—'deliberate indifference to serious medical needs'" (quoting *Estelle*, 429 U.S. at 104)). Thus, to support an Eighth Amendment or Article 55, UCMJ, claim of inadequate medical treatment, an appellant must allege both deliberate indifference and "that he suffered, or was put at risk of suffering, serious harm." *United States v. Pullings*, 83 M.J. 205, 213–14 (C.A.A.F. 2023) (citing *Estelle*, 429 U.S. at 104, 106). "Deliberate

indifference" requires that the responsible official must be aware of an excessive risk to an inmate's health or safety and disregard that risk. *Farmer*, 511 U.S. at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842 (citation omitted). One may infer "a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (citation omitted). However, "prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment . . . ." *Id.* at 844.

"A [confinee] must seek administrative relief prior to invoking judicial intervention to redress concerns regarding post-trial confinement conditions." *United States v. Wise*, 64 M.J. 468, 471 (C.A.A.F. 2007) (citation omitted); *see also White*, 54 M.J. at 472. "This generally means that the prisoner will have exhausted the detention center's grievance system and petitioned for relief under Article 138, UCMJ." *United States v. Henry*, 76 M.J. 595, 610 (A.F. Ct. Crim. App. 2017). "Exhaustion requires [an a]ppellant to demonstrate that two paths of redress have been attempted, each without satisfactory result," specifically, the prisoner-grievance system and the Article 138, UCMJ, complaint process. *Wise*, 64 M.J. at 471.

### 3. Analysis

We note at the outset that we do not equate Appellant's Article 138, UCMJ, informal complaint to an affidavit or declaration.[24] The factual assertions Appellant made in that complaint are neither sworn nor made under penalty of perjury. We have no issue of "conflicting affidavits submitted by the parties" to resolve. *See United States v. Fagan*, 59 M.J. 238, 242 (C.A.A.F. 2004) (citing *United States v. Ginn*, 47 M.J. 236, 243 (C.A.A.F. 1997)).

On appeal, Appellant claims they were denied any treatment for gender dysphoria while in confinement, to include "hormone and cognitive/behavioral therapy." First, we find support lacking for Appellant's contention that he requested but was denied cognitive or behavioral therapy. TSgt KD noted Appellant repeatedly requested hormone therapy, but neither her declaration nor Appellant's confinement treatment requests indicate Appellant requested cognitive or behavioral therapy. Similarly, we find support lacking for Appellant's contention that while confined at Malmstrom AFB Appellant requested but was denied cognitive or behavioral therapy, or requested and was denied any medical or mental health care. The declarations indicate Appellant was able to

---

[24] *See* JT. CT. CRIM. APP. R. 23(b)(2) ("If a party desires to attach a statement of a person to the record for consideration by the Court on any matter, such statement shall be made either as an affidavit or as an unsworn declaration under penalty of perjury pursuant to 28 U.S.C. § 1746.").

receive mental health treatment while confined at both at Malmstrom AFB and NAVCONBRIG.

It appears Appellant's primary claim is that the treatment plan—the MTP—addressing hormonal medication was not approved and implemented. Such claim is supported by the record; however, to prevail on a claim under the Eighth Amendment and Article 55, UCMJ, an appellant must satisfy all three prongs of *Lovett.* Appellant has not demonstrated a culpable state of mind on the part of prison officials. *Lovett*, 63 M.J. at 215. Moreover, we conclude from our review of the declarations that officials were not indifferent to Appellant's health or safety. *Id.* TSgt KD worked with other confinement officials and Appellant for over a year for Appellant to receive medical and mental health care during their confinement. Mr. EO claimed his office's actions were motivated in part to ensure Appellant's health and safety.

Appellant has failed to demonstrate that they "suffered, or was put at risk of suffering, serious harm," *Pullings*, 83 M.J. at 213–14, or that prison officials were "aware of an excessive risk to an inmate's health or safety and disregard[ed] that risk," *Farmer*, 511 U.S. at 837. In Appellant's Article 138, UCMJ, informal complaint, Appellant asserted he suffered "immense clinical distress associated with untreated GD." However, the record does not support this assertion that Appellant suffered serious harm. Confinement officials had concerns about the availability of GD-treatment medications throughout Appellant's time in confinement, and whether a break in treatment due to release from confinement may cause Appellant harm medically. Lt Col JS at THMEU understood these concerns as relayed by Mr. EO, and did not advise that Appellant should begin GD medication immediately. More importantly, the record does not support a conclusion that confinement officials knew any earlier than 18 June 2024—the date of the informal complaint—that Appellant was suffering or could suffer serious harm.[25]

Appellant has not satisfied all three prongs of *Lovett* for their complaints of Eighth Amendment and Article 55, UCMJ, violations. We find no relief is warranted.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred.

---

[25] For purposes of our analysis, we consider the AFSFC Commander a confinement official. In his reply to the informal complaint, the AFSFC Commander stated he "was not aware of [Appellant's] diagnosis or request for GD treatment until [he] received an email from [Appellant's] Defense Counsel on 18 June 2024."

Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court